IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| KAHLIG AUTO GROUP, | § | |
| | § | |
| *Plaintiff,* | § | SA-19-CV-01315-DAE |
| | § | |
| vs. | § | |
| | § | |
| AFFILIATED FM INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| *Defendant.* | § | |

## ORDER

Before the Court in the above-styled cause of action is Defendant Affiliated FM Insurance Company's Motion to Exclude Plaintiff's Expert Witness Matthew Phelps [#21], which the District Court referred to the undersigned for disposition. For the reasons that follow, the Court will deny the motion in light of certain stipulations made by Plaintiff on the record at the Court's hearing on the motion.

## I.  Background

This is a first-party insurance dispute arising out of a wind/hail event occurring on April 12, 2016. (Orig. Pet. [#1-2] at 3.) Plaintiff Kahlig Auto Group owns and operates various car dealerships in San Antonio, Texas, that are covered by a policy of insurance issued by Defendant Affiliated FM Insurance Company. (*Id.* at 4.) Plaintiff alleges that as a consequence of the wind and hail, five properties sustained extensive damage and that the insurance policy covered the properties against loss by hail, wind, and water damage. (*Id.*)

Plaintiff alleges that it timely notified Defendant of the damage, but Defendant has refused to pay Plaintiff in accordance with the policy's provisions. (*Id.*) The claims asserted in Plaintiff's original state-court Petition, which remains the live pleading in this case, are for

breach of contract and various violations of the Texas Insurance Code.  (*Id.* at 5–6.)  Plaintiff also seeks a declaratory judgment that the policy provides coverage for the cost to repair the damaged property. (*Id.* at 5.)

There are several cross motions for partial summary judgment pending in this case [#15, #19, #20], one of which is Defendant's motion for partial summary judgment on Plaintiff's claims related to the properties containing gravel-covered "built-up roofs"[1] [#20].   In this motion, Defendant argues that there is no evidence that the wind and hail storm at issue caused the alleged damage to the built-up roofs at the Mazda, Lexus, and Lincoln dealerships owned by Plaintiff.  At the center of this motion is the testimony of Plaintiff's designated expert Matthew Phelps, who concluded that the storm damage requires complete replacement of the built-up roofs of these dealerships, and whose expert report contains opinions on causation.  Defendant argues in the summary judgment motion that Phelps's testimony is unreliable and should be excluded and has filed a separate motion to exclude Phelps as an expert in this case.  The motions for summary judgment remain pending before the District Court; the motion to exclude is pending before the undersigned.

The Court held a hearing on the motion to exclude on January 13, 2021, at which all parties appeared telephonically through counsel.   In resolving the motion, the Court has considered Plaintiff's response [#29], Defendant's reply [#33], the parties' Advisory [#34], and the arguments of counsel at the hearing.

## II.  Legal Standard for Admissibility of Expert Opinions

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that any and all scientific testimony or evidence admitted

---

[1] A "built-up roof" is a flat roof constructed of layers of asphalt, applied directly on the roof structure, with a top layer of stone or gravel.  (Ex. 10 to Def.'s Mot. [#21-11] at 2.)

is not only relevant, but reliable.  Subsequent to *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness "qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *See Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting Fed. R. Evid. 702).  The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997).  The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission."  *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594–96).  Because the *Daubert* test focuses on the underlying theory upon which the opinion is based, the proponent of expert testimony need not prove the expert's testimony is correct, but rather that the testimony is reliable.  *Moore*, 151 F.3d at 276.  This determination of reliability includes a preliminary determination of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592–93.

*Daubert* sets forth four specific factors that the trial court should ordinarily apply when considering the reliability of scientific evidence: (1) whether the technique can or has been

tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique.  *Id.*  This test of reliability, however, is "flexible," and these factors "neither necessarily nor exclusively apply to all experts or in every case."  *Kumho Tire Co.*, 526 U.S. at 141.  "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Id.* at 142. "The proponent need not prove that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."  *Moore*, 151 F.3d at 276.

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Adv. Comm. Notes (2000).  *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  *Id.* (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

### III.  Analysis

Defendant challenges the reliability of the expert opinions of Matthew Phelps under *Daubert* and Rule 702.  Phelps is a licensed engineer in the State of Texas and is the CEO and Chief Engineer of APEC Engineering and Laboratory, LLC, an accredited laboratory providing in field and laboratory testing for all types of roofing systems.[2]  (Phelps Dep. [#29-5] at 19:6–14; Phelps Decl. [#29-1] at 1.)  Phelps examined and evaluated alleged damage to three of Plaintiff's

---

[2] Defendant does not challenge Phelps's qualifications as an expert.

car dealerships—the Mazda, Lexus, and Lincoln dealerships—in November 2019 (two-and-a-half years after the reported date of loss) and provided expert reports setting forth his findings. (Lexus Report [#21-2]; Lincoln Report [#21-3]; Mazda Report [#21-3].)  These reports opined that "[b]ased upon a reasonable degree of engineering certainty, it is more likely than not that the damage profile to the roof[s] of the subject propert[ies] is consistent with hail resulting from the storm event that occurred on April 12, 2016."  (Reports [#21-2, #21-3, #21-4] at 5.)  The reports also contain a specific "causation statement" that reiterates this finding and concludes that "it is more likely than not that the observed hail damage is the result of the subject storm event and that the roof suffered hail damage to the asphalt plies within the built up roof assembly."  (Lexus Report [#21-2] at 69; *see also* Lincoln Report [#21-3] at 90; Mazda Report [#21-4] at 64.) Phelps concluded that the damage requires total roof replacement of the built-up roofs on all three dealerships.  (Lexus Report [#21-2] at 69; Lincoln Report [#21-3] at 5; Mazda Report [#21-4] at 5.)  Neither Defendant's adjuster nor its expert engineer identified any damage to the built-up roofs.  (Martinez Decl. [#15-3] at 3; White Report [#15-15] at 3–11.)

## A.     Reliability of Dome Uplift or Wind-Chamber Uplift Test

Defendant's motion to exclude primarily focuses on one of the tests Phelps employed in evaluating the subject roofs—the dome uplift or wind-chamber uplift test.  According to Phelps in his deposition, the purpose of this test is to test the level of the adherence of the roof material to the substrate or underlying roof structure.  (Phelps Dep. [#21-5] at 38:15–22.)  Defendant contends that the dome uplift test is unreliable as applied to the facts of this case.  According to Defendant, Phelps may have performed the test properly, but the test was never intended for use in assessing storm damage—as used here—and was instead created to evaluate newly installed roofs systems.  In support of this argument, Defendant relies on Standard E907 of the American

Society for Testing and Materials ("ASTM"), which originally addressed the use of the dome

uplift test in new roof installations but was withdrawn seven years ago (even within that context)

and is no longer a currently approved ASTM standard due in part to concerns about the

reliability of the test among members of the National Roofing Contractors Association

("NRCA") and others.   (Phelps Dep. [#21-5] at 39:1–15; ASTM Standard [#21-6]; NRCA

Article [#21-7].)  Additionally, Defendant's global parent has a policy stating the dome uplift test

should not be used to evaluate wind uplift damage after a storm event, albeit one that was

promulgated in 2020, after Phelps's analysis was done.  (Phelps Dep. [#21-5] at 46:8–47:16; FM

Global Data Sheet [#21-8] at 4.)  Defendant also argues that Phelps's data demonstrates that he

conducted his dome uplift test at wind uplift pressures higher than the roofs experienced during

the storm event and higher than the roofs' original design pressures, further reason for finding

Phelps's determination that the built-up roofs failed the uplift tests and sustained wind damage

unreliable.  When questioned on industry standards and these identified issues at his deposition,

Phelps testified that he was not aware that the withdrawal of the ASTM standard was due partly

to reliability concerns or of the existence of the FM Global policy but believed the use of the

dome uplift test was still common within the industry for evaluating storm damage.  (Phelps

Dep. [#21-5] at 41:3–43:3.)

At the Court's hearing on Defendant's motion to exclude, Plaintiff represented on the

record that it is abandoning any claim based on wind damage to the built-up roofs and is

focusing solely on alleged hail damage.  Plaintiff also stipulated on the record that it will not rely

on the data generated from the dome uplift test or the conclusions reached therefrom in

attempting to prove causation regarding hail damage as to any claim asserted in this case.  This

stipulation moots much of the substance of Defendant's motion to exclude, and Defendant

agreed at the hearing that if this Court were to find Phelps's use of the dome uplift test as unreliable, Defendant could still testify to his opinions on the roof damage based on other aspects of his investigation and assessment.

## B.     Additional Reliability Challenges

Defendants' motion to exclude challenges Phelps's opinions on the hail damage sustained by the Lexus, Lincoln, and Mazda dealerships as unreliable for other reasons.  Primarily, Defendant argues that the data connected to Phelps's laboratory testing of samples of the roof material at issue does not support his ultimate conclusion that the storm caused the damage and that roof replacement is required.  Defendant challenges the reliability of Phelps's use of both "water column" testing and an "asphalt release" method for evaluating roof condition. Defendant also faults Phelps with failing to provide any photographic evidence depicting any hail damage to the built-up roofs and improperly relying on the observations of Defendant's employees as to the condition of the roofs after the storm, which directly contradicted the testimony of Plaintiff's corporate representative designated to testify regarding roof condition. The Court finds that these objections and challenges to Phelps's proposed testimony do not impugn the overall reliability of his opinions and are more appropriately addressed through cross examination at trial, not wholesale exclusion of Phelps as an expert.

Phelps's declaration summarizes the methodology he used in evaluating the built-up roofs of the three dealerships at issue—taking 12 inch square samples of the roof and performing both water column and delamination testing on the samples at his laboratory.  (Phelps Decl. [#30-3] at 1.)  The water column testing evaluates whether the roof sample allows water to penetrate from the surface into the asphalt layers.  (*Id.*)  Defendant argues that this test is not a reliable measure of moisture damage in built-up roofs because the procedure itself alters the

condition of the roof sample and can cause a skewed result.  Defendant also interprets Phelps's data related to his water column testing as demonstrating that 90% of the samples tested passed the test and therefore not supporting Phelps's ultimate conclusion about hail damage.

Delamination testing looks for fractures in the roof material by separating the various plies and viewing the layers microscopically for fractures.  (*Id.*)  Phelps concluded that at least one sample from each dealership showed damage consistent with hail after microscopic review of the delaminated layers.  (*Id.*)  Defendant questions the use by Phelps of the term "asphalt release" in his discussion of delamination testing, arguing that it is not recognized in the industry.

Although Defendant suggests that there are infinite other possible causes of the fractures identified by Phelps, aside from the hail storm in April 2016, the Court finds that Phelps has set forth a sufficiently reliable basis for his conclusion that the storm is what caused the fractures and identified damage.  *Daubert* does not require this Court to determine whether Phelps's conclusions are ultimately correct, only whether his methodology is reliable.  *Moore*, 151 F.3d at 276.  Phelps is entitled to draw inferences from the totality of the circumstances.  In addition to performing these tests, Phelps reviewed an analysis of published weather data from the date of the storm; physically inspected the three dealerships; interviewed employees with personal knowledge of the storm and damage; reviewed photographs of vehicles located at the three dealerships damaged by hail during the storm; and conducted thermal imagine of the built-up roofs at the three dealerships to identify areas of potential moisture for testing.  (*Id.*)  Based on the totality of the circumstances, observations, and analysis, Phelps concluded that 2 to 3.5 inch hail likely fell at the dealerships during the storm, hail that is large enough to cause damage to built-up roofs, and that wind data supported that the hail fell at a high enough impact to affect the

surface of the roofs.  (*Id.*)  That Defendant's expert reached different conclusions based on delamination testing does not make Phelps's testimony unreliable.  The discrete issues Defendant has with Phelps's testimony, such as the lack of photographic evidence and the reference to "asphalt release" can be addressed through cross examination.

Finally, the Court finds that this case is factually distinct from the cases cited by Defendant in which other district courts recently excluded Phelps from testifying at trial as an expert.  The most analogous decision cited by Defendant is a case from the Northern District of Texas, which also involved alleged wind and hail damage to built-up roofs.  *See State Auto. Mutual Ins. Co. v. Feehold Mgmt.*, No. 3:16-CV-2255-L, 2019 WL 1436659 (N.D. Tex. Mar. 31, 2019).  In that case, the court found that Phelps was qualified as an expert and that the methodology he employed was reliable, but ultimately there existed too great of an analytical gap between Phelps's data and his conclusions because he did not sufficiently explain why his data and observations supported the conclusion that the built-up roofs required replacement.  *Id.* at *15.  District courts have wide latitude in exercising their discretion to exclude an expert under *Daubert* and Rule 702.  *See Kumho Tire*, 526 U.S. at 142.  Defendant has conceded that Phelps is qualified to testify as an expert and that his methodology was sound but believes Phelps should have drawn different conclusions from his data.  In the Court's opinion, this is a matter for cross examination, not exclusion.  Notably, Defendant's expert Troy White testified in his deposition that delamination testing is the industry standard for determining roof damage within the relevant scientific community.  (White Dep. [#30-2] at 79:1–17.)  Phelps relied on this form of testing, as well as his own observations.  Any analytical gaps in his application of this methodology can be raised at trial.

C.      **Evidentiary Objections**

Both Plaintiff and Defendant raise certain objections to evidence proffered in support of their respective positions on Defendant's motion to exclude.  Plaintiff objects to Exhibit 11 attached to Defendant's motion, which is a transcript of a statement made by Phelps in a marketing video for his business.  In the video, Phelps says that his assessments of roof damage will be a "touchdown" for property owners seeking to hold insurance companies responsible for alleged damage.  The Court will dismiss this objection, as the Court need not and has not considered the transcript in reaching its conclusions on Defendant's motion to exclude.

Defendant objects to the consideration of Phelps's declaration attached to Plaintiff's response to the motion to exclude, arguing that it is an attempt to supplement Phelps's previous expert report beyond the expert designation and disclosure deadlines and therefore should not be considered.  (*See* Phelps Decl. [#30-3].)  Rule 26 of the Federal Rules of Civil Procedure requires testifying experts to provide an expert report that includes "a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; [and] any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, <u>unless the failure was substantially justified or is harmless</u>."  *Id.* at 37(c)(1) (emphasis added).

This Court has discretion to strike an affidavit if it attempts to circumvent expert designation rules by offering new or different opinions than those included in the original expert report in violation of Rule 37.  *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc*., 73 F.3d 546, 572 (5th Cir. 1996).  But where the new declaration or affidavit merely summarizes or

elaborates on previous opinions and does not depart or expand upon the original report in any material respects, the declaration or affidavit is harmless and should not be stricken. *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 371 (5th Cir. 2016).

In its reply in support of its motion, Defendant argues that Phelps's affidavit contains new opinions and improperly attempts to distance himself from the dome uplift test he employed in evaluating roof damage that is discussed extensively in his original reports. Defendant's reply asks the Court to strike the affidavit from consideration with respect to this motion and with respect to any other purpose in this case, such as the pending motion for summary judgment on causation. But at the Court's hearing, Defendant conceded that aside from the declaration's inconsistent statements with respect to the dome uplift test, the remainder of the declaration does not contain new opinions and is merely a summary of the properly disclosed expert reports. As discussed *supra*, Plaintiff is no longer relying on the dome uplift test in proving causation in this case. Based on these concessions, the Court will dismiss Defendant's objections to Phelps's declaration, and the District Court may consider the declaration in evaluating the merits of Defendant's summary judgment motion on causation. The Court notes that the statements in Phelps's declaration with respect to the dome uplift test are consistent with Plaintiff's stipulation at the Court's hearing—that the dome uplift test was not used to evaluate the cause of roof damage, only the general condition of the roofs, and the results of this test would not be used to establish causation at trial. (Phelps Decl. [#30-3] at 3.) Based on the foregoing,

**IT IS HEREBY ORDERED** that Plaintiff's and Defendant's evidentiary objections are **DISMISSED** as moot.

**IT IS FURTHER ORDERED** that Defendant Affiliated FM Insurance Company's Motion to Exclude Plaintiff's Expert Witness Matthew Phelps [#21] is **DENIED**. However, this

denial is without prejudice to Defendant raising any objections to the reliability of Phelps's testimony in a motion in limine or contemporaneously at trial before the District Court.

**IT IS FURTHER ORDERED** that, per the stipulation at the Court's hearing, Plaintiff will not rely upon the results of the dome uplift test in attempting to prove that the wind and hail storm at issue caused the damage to the subject roofs as to any claim asserted in this case.

SIGNED this 15th day of January, 2021.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE